UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

INDIA GLOBALIZATION
CAPITAL, INC.,

Case No.:      1:21-cv-01131

Plaintiff,

COMPLAINT

vs.

APOGEE FINANCIAL
INVESTMENTS, INC.,

PLAINTIFF DEMANDS
A TRIAL BY JURY

Defendant.

-------------------------------------------------------------X

Plaintiff, India Globalization Capital, Inc. ("IGC" or "Plaintiff"), in the above-entitled

matter, by and through its undersigned counsel, hereby demands judgment against Defendant,

Apogee Financial Investments, Inc. ("Apogee" or "Defendant") and alleges, upon knowledge as

to itself and its representatives, and upon information and belief as identified herein, as follows:

## PRELIMINARY STATEMENT

1.      This case arises out of a contract between Plaintiff IGC and Defendant Apogee,

whereby IGC was to purchase all membership interests in Midtown Partners and Co., LLC

("Midtown"), a Florida limited liability company, in exchange for shares of IGC's publicly

traded common stock.

2.      Apogee initially transferred 24.9% of the membership interests in Midtown, but,

ultimately, Apogee failed and refused to use good faith and best efforts to obtain Financial

Industry Regulatory Authority ("FINRA") approval for the transfer of the remaining 75.1% of

the membership interests, drastically diminishing the consideration for the underlying

agreement.

{00102398 }

1

3.      Despite negotiating into the parties' agreement a readjustment of the consideration in the event FINRA approval was not obtained (specifically return of 700,000 shares and payment of $125,000), Apogee has failed to deliver 700,000 shares of IGC common stock (or their value)[1] and $125,000 back to IGC following Apogee's breach.

4.      In addition, Apogee has failed and otherwise refused to repay a $70,000.00 loan made by IGC to Apogee.

5.      Despite IGC having gained ownership of 24.9% of Midtown, Apogee (the majority member of Midtown), has refused to treat IGC as a member and failing to pay distributions to IGC.

6.      IGC now initiates this action to recover the 700,000 shares and $195,000, plus interest, which are shares and funds to which IGC is expressly entitled under the terms of the IGC-Apogee contract, plus its share of distributions, believed to be $25,000.

## PARTIES

7.      Plaintiff IGC is a Maryland corporation, owned and operated under the laws of the State of Maryland, and has a principal place of business at 10224 Falls Road, Potomac, Maryland 20854.  For purposes of subject-matter jurisdiction, Plaintiff is a citizen of Maryland, its place of incorporation and the location of its principal place of business.

8.      On information and belief, Defendant Apogee is a Florida corporation, owned and operated under the laws of the State of Florida, and has a principal place of business at 20711 Sterlington Road, Land O'Lakes, Florida 34368.  For purposes of subject-matter jurisdiction, Apogee is a citizen of the State of Florida, its place of incorporation and the location

---

[1]      As of the date of filing of this Complaint, IGC's common stock was trading at approximately $1.97 per share.  Thus, the value of the 700,000 shares Apogee has failed to return is approximately $1,379,000, adjusted by fluctuations in the stock price.

of its principal place of business.

**JURISDICTION AND VENUE**

9.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.  Specifically, IGC is a citizen of Maryland; Apogee is a citizen of Florida; and the amount in controversy is approximately $1,600,000.00.

10.     This Court has personal jurisdiction over Defendant because it regularly transacts business within the State, and the parties agreed, by contract, to the exclusive jurisdiction of the state and federal courts in New York State to resolve any and all disputes.

11.     Venue is proper in this district because the parties agreed, by contract, to the exclusive venue of the state and federal courts in Manhattan, New York, New York to resolve any and all disputes.

**COMMON FACTUAL ALLEGATIONS**

12.     Plaintiff IGC is a publicly traded company, trading on the New York Stock Exchange American ("NYSE") under the ticker symbol "IGC."

13.     IGC generally has two lines of business:  infrastructure, including the rental of heavy construction equipment, execution of construction contracts, and the purchase and resale of physical commodities used in infrastructure; and life sciences, including legal cannabis-based products, operated in compliance with applicable federal, state, and local laws and regulations in locations where it is legal to do so.

14.     On information and belief, Midtown was, except as otherwise described herein at all times relevant hereto, an investment bank and Florida limited liability company registered as a

broker-dealer under the Securities Exchange Act of 1934 (the "Act"), as amended, and regulated by FINRA.  Midtown has offices in New York, New York.  On information and belief, in March 2020, Midtown ceased being a broker-dealer under the Act and ceased operating a securities business.

15.     In or around early 2014, IGC and Apogee entered into discussions and negotiations regarding IGC's potential acquisition of Midtown.  At that time, Apogee was the sole owner of all outstanding membership interests of Midtown.

16.     IGC and Apogee entered into a "Purchase Agreement," effective December 18, 2014 (the "Agreement"), whereby Apogee, as the sole owner of Midtown, agreed to sell 100% of Midtown's outstanding shares to IGC in exchange for 1,900,000 shares of IGC's common stock (the "Acquisition"). A true and correct copy of the Agreement is attached hereto as **Exhibit A** and is hereby incorporated by reference.

17.     The Agreement provided that, subject to certain conditions, Apogee would transfer Midtown's outstanding shares to IGC in two separate tranches on two separate closing dates.  The transaction was viewed as a whole, meaning that the total consideration IGC would issue to Apogee over the course of the two closings would constitute the total consideration for obtaining 100% of the ownership interests in Midtown.

18.     During the initial closing, Apogee would transfer 24.9% of the outstanding membership interests in Midtown to IGC, and IGC would issue 1,200,000 shares of IGC's common stock (the "Initial Shares") to Apogee.  The initial closing was to occur on December 18, 2014 ("Initial Closing").

19.     During the final closing, Apogee would transfer the remaining 75.1% of the outstanding interests in Midtown to IGC, and IGC would issue the remaining 700,000 shares of

IGC's common stock (the "Remaining Shares") to Apogee (the Initial Shares and the Remaining Shares are hereinafter collectively referred to as "the Shares").

20.     The Agreement does not provide a fixed date for the final closing.  Instead, the Agreement provides that the final closing would occur on the third business day following notification of the Parties' satisfaction of certain conditions.

21.     Pursuant to the Agreement, the Parties were required to use "best efforts" to obtain necessary regulatory approvals for the Acquisition.  Exhibit A at Section 4(a), 6(iii), 7(iv).  IGC was required to obtain the NYSE's approval to issue the Shares to Apogee, and Apogee was required to obtain FINRA's approval for the change of control of Midtown to IGC, as contemplated by the Acquisition, no later than June 30, 2015.  *Ibid.*; *see also id*. at Schedule A, at S3.

22.     IGC began the process of obtaining the NYSE's approval for the issuance of the Shares before the Agreement was executed.  In or around January 2015, the NYSE approved IGC's application to issue the Initial Shares.  Thereafter, IGC began the process of registering the Initial Shares with the Securities Exchange Commission ("SEC").

23.     On or about February 6, 2015, while waiting for SEC approval, IGC issued the Initial Shares to Apogee.  Some of the physical share certificates were immediately sent to Apogee; others (500,000 in total) remain in IGC's possession, custody, or control.

24.     In April 2015, Apogee filed documentation with the SEC confirming its ownership of the Initial Shares.

25.     On April 27, 2015, shortly after Apogee reported its ownership of the Initial Shares, John Clarke ("Clarke"), then-managing director and chief executive officer of Midtown, disclosed to IGC, for the first time, a number of liabilities and potential regulatory violations

regarding Midtown's operations.

26.     In particular, Clarke informed ICG that Midtown did not have sufficient funds to pay any April bills, the company's health insurance had been cancelled, payroll had not been made, the company's Capital Markets Compliance ("CMC") was past due, and Clarke was receiving inquiries from FINRA and Midtown's landlord.  Clarke stressed the importance of getting back in compliance and requested IGC provide a cash influx of $70,000.00.

27.     To remedy the foregoing issues, of which IGC was previously unaware, IGC agreed to loan Apogee $70,000.00 (the "Loan"), which was to be used to ensure that Midtown was in good financial and regulatory standing.  The loan was not reduced to a written agreement. Apogee agreed to repay the Loan in May 2015.

28.     Apogee failed to repay the Loan in May 2015, and at all times thereafter, has refused to repay the Loan, despite IGC's repeated demands.

29.     With respect to Apogee's obligation to use its "best efforts" to obtain regulatory approvals for the Acquisition, in early December 2014, Clarke informed IGC that once the Agreement was executed, he would be reaching out to his team so that Apogee could obtain FINRA approval.  Despite this purported commitment, Apogee did not exercise its best efforts to obtain FINRA approval.

30.     In or around April 2015, IGC discovered that Apogee had not yet applied for FINRA approval, which was concerning because, according to FINRA, approval can take as long as six month to obtain.  IGC and Apogee specifically accounted for a lengthy approval process by providing a June 30, 2015 FINRA approval deadline in the Agreement.

31.     Had Apogee applied to FINRA when the Agreement was executed, or shortly thereafter, as Clarke previously indicated it would, the Acquisition could and very likely would

have been finalized, as contemplated in the Agreement.  However, Apogee never obtained

FINRA approval, and, upon information and belief, Apogee and Clarke never even applied to

FINRA for approval of the Acquisition.

32.     Apogee has never offered a valid or credible explanation for its delay in seeking

FINRA approval.

33.     The Agreement provides a remedy for IGC and Apogee in the event the

Acquisition cannot be finalized due to Apogee's failure to obtain FINRA approval.  Specifically,

Schedule A of the Agreement provides that in the event IGC has issued the Initial Shares, but the

FINRA approval has not been obtained by June 30, 2015, then, provided Midtown has received a

$325,000.00 cash infusion from Apogee as contemplated elsewhere in the Agreement, the parties

would readjust the consideration for the entire deal, with Apogee returning to IGC 700,000

shares of IGC common stock and paying IGC $125,000 (the "Readjustment").

34.     The Readjustment was contemplated specifically because, failing FINRA

approval by June 30, 2015, IGC legally could not obtain the remaining 75.1% membership

interest in Midtown, materially altering the consideration for the Agreement, i.e., IGC would be

obtaining less than one-quarter of the value originally contemplated.

35.     Upon information and belief, Apogee made a $325,000.00 cash infusion to

Midtown prior to June 30, 2015.  Yet, Apogee has not returned any of the Shares to IGC and has

not made any Readjustment payment to IGC, despite IGC's demands for the same.

36.     Upon information and belief, sometime after June 2015, Apogee sold 300,000 of

the Initial Shares to a third party.

37.     Pursuant to the Agreement, IGC has held a 24.9% membership interest in

Midtown since the Initial Closing.  However, Apogee and Midtown did not treat IGC as a

member, failing to share any information with IGC regarding Midtown's financial and/or business dealings.

38.     IGC is entitled to a pro rata share of Midtown distributions due to its membership interest in the company.  For instance, in Midtown's annual audited report for 2016, filed with the SEC, Midtown disclosed over $3.3 million in revenues, with over $800,000 in profits. However, no distributions were ever paid to IGC.

39.     It was later discovered that in 2015 and 2016, Apogee issued itself at least $75,000.00 in distributions without issuing a proportionate distribution to IGC.

40.     Documents filed with the SEC indicate that, in 2016, Midtown made distributions with a value of $640,000.00 to its "member."  IGC did not receive any member distributions from Midtown in 2016, or in any other year.

41.     Despite its long-standing history of ignoring IGC's membership in Midtown, when Midtown was allegedly on the verge of insolvency in April 2019, the company, acting through Clarke, demanded, pursuant to a purported "capital call," and on seven days notice, that IGC contribute $264,927.00 ("Additional Capital") to Midtown.  Without providing any supporting documentation, Clarke asserted that absent IGC's provision of the Additional Capital, Midtown would be unable to conduct a securities business and would cease to operate as a broker-dealer.

42.     When IGC objected to the capital call, Clarke acknowledged that he had not been in contact with IGC in two years and Midtown and Apogee had not provided documentation to IGC during that period of time.

43.     IGC was under no obligation, contractual or otherwise, to provide the Additional Capital and refused Midtown's unsubstantiated and unreasonable demand for the same.

{00102398 }

44.     In or around March 2020, Midtown and/or Apogee published a note to its website explaining:  "As of March 2020 Midtown Partners is no longer conducting a Securities business."

45.     IGC initiates this action to obtain the relief due to it under the Agreement, specifically, the return of 700,000 shares of IGC common stock (or its monetary equivalent), the $125,000.00 contemplated by the Agreement, and the $70,000.00 loan IGC made to Apogee in April 2015, plus pre-judgment interest.

46.     Pursuant to Section 9 of the Agreement, IGC and Midtown agreed that questions concerning the construction, validity, enforcement and interpretation of the Agreement shall be governed by the laws of the State of New York and both parties to the Agreement submitted to the exclusive jurisdiction of the state and federal courts sitting in The City of New York, Borough of Manhattan, for the adjudication of any dispute under or in connection with the Agreement or with any transaction contemplated by the Agreement.

## CAUSES OF ACTION

### COUNT I – Breach of Contract, Written Agreement

47.     Plaintiff incorporates by reference Paragraphs 1 through 46 of this Complaint as if fully set forth and restated herein

48.     Effective on or about December 18, 2014, IGC and Apogee entered in the Agreement, a copy of which is appended hereto and marked as "Exhibit A."

49.     The Agreement is a valid and enforceable contract between IGC and Apogee.

50.     The Agreement imposed a duty on Apogee to use best efforts to obtain FINRA approval for the Acquisition.

51.     At all times relevant hereto, Apogee failed to exercise best efforts to obtain FINRA approval for the Acquisition, and, upon information and belief, never even applied for

FINRA approval, thereby breaching its obligations under the Agreement.

52.     As a direct and proximate result of Apogee's breach of the Agreement, IGC has suffered damages, and, as a result of Apogee's failure to obtain FINRA approval by June 30, 2015, Apogee is required, under the terms of the Agreement, to return 700,000 of the Shares to IGC, currently valued at approximately $1,379,000.00 (as of February 8, 2021, variable in accordance with IGC's stock price), and pay IGC $125,000.00, plus pre-judgment interest of 9% per annum under N.Y. CPLR § 5001 (McKinney 1992).

53.     Plaintiff has made repeated demands for Apogee to comply with the terms of the Agreement, but Apogee has failed and/or otherwise refused to do so.

### COUNT TWO – Breach of Contract, Unwritten or Oral Agreement

54.     Plaintiff incorporates by reference Paragraphs 1 through 53 of this Complaint as if fully set forth and restated herein.

55.     In April 2015, IGC and Apogee entered in the Loan Agreement.

56.     The Loan is a valid and enforceable contract between IGC and Apogee.

57.     Pursuant to the Loan, IGC agreed to lend Apogee $70,000.00, and Apogee agreed to repay the Loan in May 2015.

58.     At all times relevant hereto, Apogee has failed to repay the Loan, despite IGC's demands.

59.     As a direct and proximate result of Apogee's breach of the Loan agreement, IGC has suffered damages in the amount of $70,000.00, plus pre-judgment interest of 9% per annum under N.Y. CPLR § 5001 (McKinney 1992).

60.     Plaintiff has made repeated demands for Apogee to comply with the terms of the Loan Agreement, but Apogee has failed and/or otherwise refused to do so.

{00102398 }

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(1)     Enter an Order requiring Apogee to comply with the terms of the Agreement by returning 700,000 of the Shares to IGC (or awarding its monetary equivalent), or in the alternative, enter an Order granting IGC authority to cancel 700,000 Shares issued to Apogee;

(2)     Enter judgment in Plaintiff's favor, against Apogee, in the amount of $195,000.00, representing $125,000.00 pursuant to the Agreement and $70,000 pursuant to the Loan Agreement, plus pre-judgment interest of 9% per annum under N.Y. CPLR § 5001 (McKinney 1992), plus post-judgment interest, attorneys' fees, and costs; and

(4)     Grant such other relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a trial by jury in this action.

Respectfully submitted,

Dated: February 8, 2021

Sarah L. Nash, Esq. (Bar Code:  SN2711)
*snash@pilieromazza.com*
Matthew E. Feinberg, Esq. (*pro hac vice* pending)
*mfeinberg@pilieromazza.com*
Megan A. Benevento, Esq. (*pro hac vice* pending)
*mbenevento@pilieromazza.com*
PILIEROMAZZA PLLC
888 17th Street, N.W., 11th Floor
Washington, D.C. 20006
Ph: (202) 857-1000
Fx: (202) 857-0200

*Counsel for Plaintiff, India Globalization Capital, Inc.*

{00102398 }

11