USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/20/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
INDIA GLOBALIZATION CAPITAL, INC.,    :
    :
                           Plaintiff,    :
    :        21-CV-1131 (VEC)
        -against-    :
    :        OPINION AND ORDER
APOGEE FINANCIAL INVESTMENTS, INC.,    :
    :
                      Defendant.    :
-------------------------------------------------------------X

-------------------------------------------------------------X
APOGEE FINANCIAL INVESTMENTS, INC.,    :
JOHN R. CLARKE,    :
    :
              Counterclaim-Plaintiffs,    :
    :
        -against-    :
    :
RAMACHANDRA MUKUNDA, INDIA    :
GLOBALIZATION CAPITAL, INC.,    :
    :
              Counterclaim-Defendants.    :
-------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

India Globalization Capital, Inc. ("IGC") and Apogee Financial Investments, Inc. ("Apogee") are suing each other and individuals affiliated with each company for breach of contract as a result of a failed business deal that was not well documented.[1]  IGC has moved for summary judgment as to all claims.  *See* Pl. Not. of Mot., Dkt. 87.  For the following reasons, IGC's motion is GRANTED in part and DENIED in part.

---

[1]  Apogee's counterclaims were initially brought as a separate case.  *See Apogee Fin. Invs., Inc. v. Mukunda*, No. 21-CV-3809 (VEC) (S.D.N.Y. Apr. 29, 2021).  On April 30, 2021, the Court consolidated the two cases under Docket No. 21-CV-1131.  *See* Endorsement, Dkt. 16.

    Apogee and Clarke have abandoned their claims against IGC's CEO Ramachandra Mukunda.  *See* Defs. Mem., Dkt. 99, at 1.  Accordingly, Ramachandra Mukunda is dismissed from this action.

## BACKGROUND[2]

### I.      The Purchase Agreement Transaction

IGC is a publicly-traded penny stock corporation listed on the New York Stock Exchange.  Consolidated Rule 56.1 Stmt., Dkt. 102-1, ¶¶ 1–2.  In 2014, IGC sought to acquire Midtown Partners & Co., LLC ("Midtown"), a then-registered broker dealer that was wholly owned by Apogee.  *Id.* ¶¶ 24–25, 27.  On December 18, 2014, Apogee and IGC entered into a Purchase Agreement.  *Id.* ¶ 27; *see also* Purchase Agreement, Dkt. 88-2.  Pursuant to the Purchase Agreement, IGC agreed to purchase Midtown in two phases: the "Initial Closing" and the "Final Closing."  Consolidated Rule 56.1 Stmt. ¶ 30; *see* Purchase Agreement § 1.

At the Initial Closing, to be completed by 5:00 P.M. on December 18, 2014,[3] IGC would acquire 24.9% of Midtown in exchange for "issu[ing]" 1.2 million shares of IGC common stock (the "Initial Shares") to Apogee.  Consolidated Rule 56.1 Stmt. ¶ 31; *see* Purchase Agreement § 1(a).  Section S1 of Schedule A of the Purchase Agreement, which addresses the Initial Shares, provides that the shares will be issued in two segments: 200,000 shares to be held in escrow pending the Final Closing; and 1 million shares that are "contingent" on (a) an infusion of $325,000 in capital to Midtown either prior to or contemporaneously with the Initial Closing and (b) filing a registration statement with the SEC to register the shares.  The final paragraph of Section S1 provides: "If the balance sheet of Midtown at the time of filing the registration statement does not show $325,000 of cash deposited in the months of October 2014 through

---

[2]      All facts described herein are undisputed unless otherwise stated.  In some instances, the parties purport to dispute facts set forth in each other's Rule 56.1 statements even though their purported objections are not responsive to the asserted facts.  In those instances, which the Court does not always identify, the Court considers the facts undisputed.

[3]      The parties changed the Initial Closing date from December 11, 2014 to December 18, 2014 to give Apogee more time to capitalize Midtown.  *See* Consolidated Rule 56.1 Stmt., Dkt. 102-1, ¶¶ 127–29.

December 2014, but prior to Initial Closing, then Apogee will lose its pro rata rights to these shares."[4]  *See* Purchase Agreement Schedule A § S1.  As required by the Purchase Agreement, IGC appointed John Clarke ("Clarke"), Midtown's former CEO and principal, as IGC's Principal Financial and Accounting Officer.  Consolidated Rule 56.1 Stmt. ¶¶ 22, 35.  That appointment occurred on December 10, 2014, prior to the Initial Closing.  *Id.* ¶ 98.

Pursuant to the Purchase Agreement, at the "Final Closing," IGC would acquire the remaining interest in Midtown, and Apogee would receive an additional 700,000 shares of IGC stock (the "Remaining Shares").  *Id.* ¶ 36; *see* Purchase Agreement § 1(b).  One condition for the Final Closing was Apogee using its "best efforts" to obtain approval of the transaction from the Financial Industry Regulatory Authority ("FINRA") by June 30, 2015.  *See* Purchase Agreement §§ 4, 6(iii), 8; Schedule A § S3.[5]  To secure FINRA approval for Midtown's change of ownership, Apogee was required to file a Continuing Membership Application ("CMA") with FINRA.  Consolidated Rule 56.1 Stmt. ¶ 38.[6]  Apogee never filed a CMA with FINRA, and FINRA never approved a change in ownership of Midtown.  *Id.* ¶ 91.[7]

---

[4]     Although the provision is very poorly worded, there does not appear to be any dispute that the intent of the parties was that if the required infusion of capital did not appear on the balance sheet before or contemporaneously with the Initial Closing, there would be a percentage reduction in the number of shares issued to Apogee equal to the percentage of shortfall of the capital infusion.

[5]     Apogee and Clarke assert, without citing any support in the record, that "both IGC and Apogee" were required to use best efforts to obtain FINRA approval.  *See* Consolidated Rule 56.1 Stmt. ¶ 37.  The Court does not credit this assertion because it is unsupported in the record and defies the plain language of the Purchase Agreement.  *See* Purchase Agreement, Dkt. 88-2, §§ 4, 6(iii).

[6]     Apogee and Clarke maintain that FINRA allows the acquisition of "an interest of 24.9% o[r] less" in a broker-dealer like Midtown without a CMA.  *See* Consolidated Rule 56.1 Stmt. ¶ 38.  That is interesting but irrelevant; IGC sought to purchase 100% of Midtown.

[7]     The Purchase Agreement addressed what would happen in the event FINRA approval was not obtained by June 30, 2015.  Specifically, if FINRA approval was not obtained by June 30, 2015, and if IGC had issued only the 200,000 Initial Shares that were held in escrow, those shares would be released and there would be no further penalty.  *See* Purchase Agreement Schedule A § S3(1).  On the other hand, if IGC had issued 1.2 million Initial Shares and if Apogee had made a $325,000 cash infusion into Midtown, then Apogee would return 700,000 of the Initial Shares and would pay IGC $125,000.  *See id.* Schedule A § S3(2)(a).

Between October 1, 2014 and December 18, 2014, Apogee failed to capitalize Midtown as required by the Purchase Agreement, depositing only $219,000 into Midtown. *Id.* ¶ 69.[8] By the end of 2014, however, Apogee had deposited $344,000 into Midtown. *See* Transaction Report, Dkt. 89-23.

On December 23, 2014, IGC filed a Form 8-K with the Securities and Exchange Commission (the "SEC"); the Form 8-K stated that IGC, "subject to downward adjustment based on certain Q4 2014 financial statement matters," had issued 1.2 million shares to Apogee of IGC's common stock. Consolidated Rule 56.1 Stmt. ¶ 45; Form 8-K, Dkt. 89-22, Item 3.02.

On January 22, 2015, the NYSE approved the listing of 1.2 million shares of IGC common stock on the public exchange. Consolidated Rule 56.1 Stmt. ¶ 48.[9] IGC's CEO Ramachandra Mukunda ("Mukunda") sent Clarke and Apogee a draft of the Form S-3 that was required to register the Initial Shares, *see id.* ¶¶ 49, 51; Purchase Agreement Schedule A § S1. That form stated that the 1.2 million Initial Shares were "subject to downward adjustment based on certain fourth quarter 2014 financial statement matters." Consolidated Rule 56.1 Stmt. ¶ 51; *see* Email, Dkt. 88-12. IGC also noted that certain "issues" needed to be resolved, including the amount of cash on Midtown's balance sheet and the status of FINRA approval. Consolidated Rule 56.1 Stmt. ¶ 50. On January 29, 2015, IGC's counsel opined that 1.2 million Initial Shares

---

The Purchase Agreement also provided that if the Final Closing did not take place by June 30, 2015, due to either party's failure to satisfy certain contractual conditions, the "non-breaching party" had the option to terminate the Purchase Agreement without liability. *See id.* § 8.

[8]     Apogee and Clarke assert that Apogee signed the Purchase Agreement "contemporaneously with the final deposit required to complete the placement of $325,000 into Midtown." *See* Consolidated Rule 56.1 Stmt. ¶ 132. The Court does not credit this statement because it is contradicted by the evidence in the record. *See* Transaction Report, Dkt. 89-23.

[9]     IGC applied for the listing on December 11, 2014. *See* Consolidated Rule 56.1 Stmt. ¶ 47.

could be issued to Apogee, and IGC filed a Form S-3 for the Initial Shares with the SEC.  *Id.* ¶¶ 53, 55.

On February 2, 2015, IGC instructed its stock transfer agent to issue 1.2 million shares of IGC common stock to Apogee.  *Id.* ¶ 56.  The next day, IGC's transfer agent issued the Initial Shares to Apogee in certificate form with restrictive legends.  *Id.* ¶ 57.

On April 10, 2015, IGC instructed its transfer agent to cancel the certificate form of 700,000 of the previously-issued Initial Shares and to deliver those same shares to Apogee electronically.  *Id.* ¶ 62.  IGC's instruction to its transfer agent noted that the 1.2 million shares initially issued to Apogee had been issued "subject to downward adjustment based on certain Q4 2014 financial statement matters, represent[ing] 700,000 unrestricted shares as of now."  *Id.* ¶ 63. On April 23, 2015, Apogee received 700,000 unrestricted IGC shares electronically.  *Id.* ¶ 64. IGC holds the remaining 500,000 Initial Shares in certificate form in Apogee's name.  *Id.* ¶ 65.[10]

On June 17, 2015, Apogee informed IGC that IGC was in material breach of the Purchase Agreement because it had not delivered 1 million Initial Shares to Apogee upon the Initial Closing.  *Id.* ¶ 154.

Although Midtown's regulatory compliance consultant prepared a draft CMA and sent it to Clarke for review and approval, Clarke never responded.  *Id.* ¶¶ 80–81.  Neither Apogee nor Midtown ever submitted a CMA to FINRA so that the transaction could be approved.  *Id.* ¶ 91.[11]

---

[10]     Apogee and Clarke assert that this fact is disputed, but do not cite any relevant facts from the record to the contrary.  *See* Consolidated Rule 56.1 Stmt. ¶ 65.

[11]     The parties dispute how long the FINRA approval process typically takes.  *Id.* ¶ 39.  Because it is undisputed that FINRA never received a CMA for the transaction, and Midtown's application could therefore not be processed, this dispute is immaterial.

## II.     IGC's Loan to Apogee

In April 2015, IGC agreed to lend Apogee $70,000 to deal with a liquidity crisis; Apogee agreed to repay the full amount by May 6, 2015 (the "Loan Agreement").  *Id.* ¶¶ 94–95.  IGC wired $70,000 to Apogee; the loan has not been repaid.  *Id.* ¶¶ 96–97.

## III.     Clarke's Executive Compensation

On or about February 12, 2016, IGC agreed to pay Clarke a salary of 200,000 IGC shares per year as compensation for serving as IGC's Principal Financial and Accounting Officer (the "Shares Agreement").  *Id.* ¶ 106–07, 113–14.  The shares for the salary were granted to Clarke, "subject to vesting," pursuant to IGC's Employee Stock Ownership Plan.  *Id.* ¶ 106.  IGC informed Clarke of the compensation and of the need for paperwork to be completed in connection with the compensation.  *Id.* ¶ 107.

On November 14, 2016, IGC terminated Clarke as an officer of IGC.  *Id.* ¶ 119.  Clarke declined a non-management position and was no longer employed by the company as of February 12, 2017.  *Id.* ¶¶ 120–21.  He had not received the shares at the time he was terminated.  *Id.* ¶ 160.

In about December 2018, a cannabis business contacted Clarke asking for an introduction to IGC.  *Id.* ¶ 159.  The parties dispute what happened next.  According to Clarke and Apogee, Mukunda said that IGC would pay Clarke 200,000 shares of IGC stock if he made the introduction.  *Id.* ¶¶ 160–61.  According to IGC, Mukunda never promised Clarke 200,000 shares of IGC common stock in exchange for a business introduction.  *Id.*

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  "A genuine dispute exists when the evidence is such that, if the party against whom summary judgment is sought is given the benefit of all permissible inferences and all credibility assessments, a rational factfinder could resolve all material factual issues in favor of that party."  *SEC v. Sourlis*, 851 F.3d 139, 144 (2d Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "Summary judgment is appropriate when there can be but one reasonable conclusion as to the verdict, . . . *i.e.*, it is quite clear what the truth is, . . . and no rational factfinder could find in favor of the nonmovant."  *Id.* (citations and internal quotation marks omitted).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," and "may not rely on conclusory allegations or unsubstantiated speculation."  *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (citations and internal quotation marks omitted).  Rather, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial."  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citation omitted).

IGC has not established that it is entitled to judgment as a matter of law regarding Apogee's and Clarke's claims that it breached the Purchase Agreement with respect to the Initial Shares because there is a triable issue of fact whether IGC breached the contract by issuing restricted shares.  The Court grants summary judgment in IGC's favor regarding all remaining claims, however, because there is no question of fact that: Apogee breached the Purchase Agreement by failing to use best efforts to obtain FINRA approval for the acquisition of Midtown; Apogee breached the Loan Agreement by failing to repay IGC; and Clarke's claim for breach of the Shares Agreement is time barred.

## I.  Legal Standard

To prove breach of contract under New York law,[12] a plaintiff must prove "(1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." *Terwilliger v. Terwilliger*, 206 F.3d 240, 245–46 (2d Cir. 2000).  Plaintiffs bear the burden of proof as to all elements of a breach of contract claim.  *See Raymond v. Marks*, 116 F.3d 466, 466 (2d Cir. 1997) (unpublished table decision).

Contractual terms are given their plain meaning.  *See LaSalle Bank Nat'l Ass'n v. Nomura Asset Cap. Corp.*, 424 F.3d 195, 206 (2d Cir. 2005); *CIBC World Mkts. Corp. v. TechTrader, Inc.*, 183 F. Supp. 2d 605, 610–11 (S.D.N.Y. 2001).  Summary judgment is only proper "if the language of the contract is wholly unambiguous."  *Mellon Bank, N.A. v. United Bank Corp. of N.Y.*, 31 F.3d 113, 115 (2d Cir. 1994) (internal quotation marks and citation omitted).  Contract language is "ambiguous" if "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 316 (2d Cir. 2006) (internal quotation marks and citation omitted).

If a party materially breaches a contract, the non-breaching party must choose between two remedies: it can either "elect to terminate the contract and recover liquidated damages" or it can "continue the contract and recover damages solely for the breach."  *ESPN, Inc. v. Office of Comm'r of Baseball*, 76 F. Supp. 2d 383, 387 (S.D.N.Y. 1999) (citation omitted).

---

[12]    The parties agree that New York law applies to their claims.  *See* Pl. Mem., Dkt. 88, at 8; Defs. Mem. at 7–8.

When the breach of contract is "the failure to deliver the correct number of shares of stock, the proper measure of damages is to determine the loss sustained or gain prevented at the time and place of breach." *Freishtat v. LivePerson, Inc.*, 871 F. Supp. 2d 293, 316 (S.D.N.Y. 2012) (citation omitted); *see also Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145 (1971); *Lucente v. Int'l Bus. Machs. Corp.*, 310 F. 3d 243, 262 (2d Cir. 2002).  A defendant is only entitled to summary judgment as to a lack of damages if the plaintiff has failed to raise a genuine issue of material fact "as to the existence of alleged damages, including nominal damages." *N.Y.C. Transit Auth. v. Express Scripts, Inc.*, No. 19-CV-5196 (JMF), 2022 WL 3577426, at *3 (S.D.N.Y. Aug. 19, 2022) (internal quotation marks omitted and collecting cases).

## II.    There is a Question of Fact Whether IGC Breached the Purchase Agreement by Issuing Restricted, Rather Than Freely Tradable, Shares to Apogee

IGC urges the Court to conclude that it did not breach the Purchase Agreement because Apogee was only entitled to 673,800 Initial Shares given its failure adequately to capitalize Midtown by the Initial Closing date, and because IGC issued 1.2 million Initial Shares to Apogee in certificate form on February 3, 2015.  *See* Pl. Mem. at 9–12.  IGC ignores, however, that the Purchase Agreement is silent as to whether the Initial Shares were to be restricted or freely tradable.  IGC's failure to address this issue is fatal to its summary judgment motion.[13]

The Purchase Agreement generally required IGC to "issue" 1.2 million Initial Shares in the form of "common stock" to Apogee "on the Initial Closing [d]ate" as set out in Schedule A.

---

[13]    Apogee asserted in response to IGC's interrogatories that IGC first breached the Purchase Agreement when it issued Initial Shares in certificate form on February 3, 2015, *see* Defs. Interrogs. Resps., Dkt. 89-9, at No. 25, and took the same position in its memorandum opposing summary judgment, *see* Defs. Mem. at 2, 5.  The Court therefore concludes that Apogee is not asserting any claim for breach of contract that may have predated February 3, 2015.  *Cf. U.S. Bank Nat'l Ass'n v. Windstream Servs., LLC*, No. 17-CV-7857 (JMF), 2019 WL 948120, at *21 (S.D.N.Y. Feb. 15, 2019) (noting that "interrogatory responses are generally treated as judicial admissions" and a judicial admission "is conclusive, unless a court allows it to be withdrawn" (internal quotation marks and citation omitted)).

*See* Purchase Agreement § 1(a)(i).  Schedule A provided that 200,000 of those shares were to be held in escrow, and the remaining 1 million shares were to be issued "contingent" on (a) Midtown's balance sheet reflecting a $325,000 cash infusion "prior or contemporaneously with" the Initial Closing and (b) registering the Initial Shares with the SEC.  *See id.* Schedule A § S1. The Initial Closing took place on December 18, 2014, and IGC registered the Initial Shares with the SEC on January 29, 2015.  Consolidated Rule 56.1 Stmt. ¶¶ 31, 55.  A few days later, on February 3, 2015, IGC issued 1.2 million Initial Shares to Apogee in restricted, certificate form. *Id.* ¶ 57.  According to Apogee, IGC breached the Purchase Agreement because IGC was required to issue the shares to Apogee in freely tradable form.  *See* Defs. Mem. at 5.[14]

Because the Purchase Agreement merely required IGC to issue "common stock" — without specifying whether the stock was to be restricted or not — the contract is ambiguous in that respect.  *See Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 149–50 (2d Cir. 1993) (concluding that a contract was ambiguous because it said "nothing" about whether shares "were to be restricted or unrestricted" and remanding the case to the district court for the receipt of extrinsic proof to settle the issue).[15]  Because there is a question of fact whether the contract was breached, IGC is not entitled to summary judgment.  *Id.*

---

[14]    Apogee does not challenge the timeliness of the shares' issuance on February 3, 2015.

[15]    The parties also dispute whether IGC's obligation to "issue" shares to Apogee under the Purchase Agreement merely required IGC to *register* the shares in Apogee's name or whether it also required IGC to *deliver* the shares to Apogee.  *See* Pl. Mem. at 11–12; Defs. Mem. at 9.  The Court agrees with IGC that the term "issue" under the Purchase Agreement does not refer to the delivery of shares.  The Purchase Agreement stated that 200,000 Initial Shares were to be "issued" but held in escrow, *see* Schedule A § S1(1); shares under the contract could, therefore, be "issued" but not within Apogee's possession.  Indeed, Apogee and Clarke concede in their counterstatement of material facts that IGC "*did issue* 1.2 million shares to Apogee" on February 3, 2015. Consolidated Rule 56.1 Stmt. ¶ 60.  That is beside the point, however, because, as discussed *infra*, what matters is whether the parties intended IGC to issue restricted or freely tradable shares, a detail that is not addressed by the Purchase Agreement.

IGC also argues that, even if it did breach the contract, Apogee did not suffer any damages and, therefore, summary judgment is appropriate.  *See* Pl. Mem. at 18; Pl. Reply, Dkt. 102, at 5–6.[16]  That argument fails for two reasons.  As a general matter, IGC cannot prevail at summary judgment because it has failed to address whether, even if there were no actual damages, Apogee would be entitled to nominal damages resulting from the alleged breach.  *See Medacist Sols. Grp., LLC v. CareFusion Sols., LLC*, No. 19-CV-1309 (JMF), 2021 WL 293568, at *13 (S.D.N.Y. Jan. 28, 2021) (denying summary judgment on a claim for breach of contract in part because "[n]ominal damages are always available in breach of contract damages" (quoting *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 976 F.3d 239, 247 n.10 (2d Cir. 2020))); *Tradex Europe SPRL v. Conair Corp.*, No. 06-CV-1760 (KMW), 2008 WL 1990464, at *5 (S.D.N.Y. May 7, 2008) (denying summary judgment on a claim for breach of contract because, even though plaintiffs failed to produce evidence of any direct or consequential damages, the defendant "fail[ed] to address" whether plaintiffs could recover nominal damages).[17]

Beyond that, the Court is not persuaded that IGC's theory of damages is correct.  According to IGC, Apogee suffered no damages because it also breached the Purchase Agreement, requiring it to return 700,000 Initial Shares, plus $125,000, on July 1, 2015.  Pl.

---

[16]    IGC has established, as discussed *infra*, that Apogee was not entitled to 1 million Initial Shares in addition to the 200,000 Initial Shares that are being held in escrow because its infusion of capital into Midtown was not timely.

[17]    As discussed *infra*, Apogee breached the Purchase Agreement by failing timely to seek FINRA approval of the parties' transaction; a party generally cannot recover for breach of contract if it breached the agreement at issue. *See Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).  A breaching party may, however, sue for breach of contract if it "substantially performed" its end of the bargain.  *See Wechsler v. Hunt Health Sys., Ltd.*, 330 F. Supp. 2d 383, 421 (S.D.N.Y. 2004) (collecting cases).  Whether a party substantially performed is a fact-intensive inquiry, *see Hadden v. Consol. Edison Co. of N.Y., Inc.*, 34 N.Y.2d 88, 96 (1974), which the parties have not briefed.  The Court, therefore, does not decide at this stage whether Apogee's own breach forecloses its claim for breach of contract against IGC.

Mem. at 18–19.[18]  But calculating expectation damages in the context of undelivered, freely

tradable stock is more nuanced than simply subtracting the number of Initial Shares Apogee was

obligated to return on July 1, 2015 from the total number of Initial Shares to which Apogee was

originally entitled.  *See Freishtat*, 871 F. Supp. 2d at 316 (calculating damages for the "failure to

deliver the correct number of shares of stock" on a particular date by multiplying the number of

missing shares by the stock's closing price at the time of breach and applying a 5% discount to

account for "trading restrictions"); *Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 147 (1971)

(concluding that damages for the "nondelivery of shares of stock" should have been determined

by multiplying the number of missing shares by the stock's price at the time of breach and

applying a discount if the shares were to be restricted); *see also Schonfeld v. Hillard*, 218 F.3d

164, 178–79 (2d Cir. 2000) (noting that if an asset is "actively traded on a standardized

exchange," the value on that exchange may be used to determine an asset's fair market value at

the time of breach).  IGC has, therefore, not established that any breach of the Purchase

Agreement resulted in no damages.

Although IGC may have breached the Purchase Agreement by issuing restricted rather

than freely tradable shares to Apogee, IGC has met its burden of showing that, putting aside the

200,000 shares in escrow, Apogee was entitled to only 673,846 Initial Shares, rather than 1

million Initial Shares.  The Initial Closing was on December 18, 2014; by that date, Apogee had

deposited only $219,000 into Midtown.  *See generally* Transaction Report, Dkt. 89-23.  Because

---

[18]      There remain triable issues of fact, however, as to whether Section S3 of Schedule A determines damages
because the provision IGC cites in favor of its damages calculation only applies in the event IGC "has issued a total
of 1,200,000 Initial Shares."  *See* Purchase Agreement Schedule A § S3(2)(a).  IGC issued only 700,000 *freely
tradable* shares.  *See* Consolidated Rule 56.1 Stmt. ¶ 64.  IGC has, therefore, not established that Section S3 of
Schedule A necessarily applies here, nor offered an alternative damages calculation in the event it does not apply.

Apogee capitalized Midtown by less than 70% of the contractually required $325,000 ($219,000

÷ 325,000 = 67.38%), IGC was only obligated to issue 673,846 shares to Apogee.[19]

Apogee insists that it was entitled to the full 1 million Initial Shares because Apogee

contributed more than $325,000 to Midtown by the end of December 2014.  *See* Defs. Mem. at 8.

That argument fails because Apogee fails to address a key provision in the Purchase Agreement:

the final provision in Section S1 of Schedule A, which governs the Initial Shares.  That provision

indicates that if Midtown's balance sheet does not show an infusion of $325,000 in cash to

Midtown during the months of October 2014 through December 2014 and prior to the Initial

Closing, then Apogee's right to the 1 million additional shares will be reduced pro rata.  *See*

Purchase Agreement Schedule A § S1.  The deadline for Apogee to capitalize Midtown was

therefore December 18, 2014; not December 31, 2014, as Apogee presumes.

Apogee does not address this key provision in its memorandum of law at all.[20]  Instead, it

asserts in its counterstatement of material facts that it was entitled to 1 million Initial Shares

because it transferred more than $325,000 to Midtown shortly *after* the Initial Closing.  *See*

Consolidated Rule 56.1 Stmt., Dkt. 99-1, ¶ 68.  Putting aside the impropriety of raising this

defense in a counterstatement of material facts, *see Emanuel v. Griffin*, No. 13-CV-1806 (JMF),

2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015) (collecting cases) (ignoring any "improper

legal argument" in a Rule 56.1 Statement), it fails as a matter of New York law.  When a contract

---

[19]     For reasons that are unclear, IGC rounded that number up to 700,000 when it transferred the Initial Shares to Apogee, and rounded that number down to 673,800 in its briefing.  *See* Pl. Mem. at 3, 11.

[20]     It is unfortunate that Apogee did not address this provision because IGC's reading of it is not beyond dispute, mostly because the provision is a grammatical mess.  It provides, in relevant part, that if, at the time the registration statement is filed with the SEC, the balance sheet of Midtown "does not show $325,000 of cash deposited in the months of October 2014 through December 2014, but prior to Initial Closing, then Apogee will lose its pro rata rights to these shares."  Purchase Agreement Schedule A § S1.  Apogee has not advanced a contrary interpretation of the intent of the parties as reflected by that garbled provision, and IGC's interpretation is reasonable.

specifies a date of performance, the date must be "strictly enforced"; the parties are "presumed to have agreed that time is of the essence unless there is contract language to the contrary." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 523 (2d Cir. 1990) (collecting cases); *see also Kolmar Ams., Inc. v. Koch Supply & Trading, LP*, No. 10-CV-7905 (JSR), 2011 WL 6382566, at *8 (S.D.N.Y. Dec. 15, 2011) (concluding that because the contract at issue "clearly specifie[d] a definite time of performance, time was of the essence under th[e] agreement unless circumstances or the language of the [c]ontract evidence[d] a contrary intent"). Apogee has not raised, and the Court has not discerned, any contrary contractual language or circumstances evidencing that the parties did not intend to enforce the express deadline contained in the Purchase Agreement.  To the contrary, IGC's press release and SEC filings, which were circulated to Apogee, indicated that the Initial Shares were "subject to downward adjustment" based on "certain Q4 2014 financial statement matters."  *See* Press Release, Dkt. 89-17; Form 8-K, Dkt. 89-22, Item 3.02; Email, Dkt. 88-12.

Apogee also asserts in its counterstatement of material facts that IGC waived the December 18, 2014 deadline by filing a Form S-3 to register the Initial Shares on January 23, 2015.  *See* Consolidated Rule 56.1 Stmt. ¶ 68.  Once again, that argument was both improperly raised, *see Emanuel*, 2015 WL 1379007, at *2, and fails as a matter of New York law.  Waiver is "not lightly presumed"; the intent to waive a contractual condition "must be unmistakably manifested, and is not to be inferred from a doubtful or equivocal act." *Jofen v. Epoch Biosciences, Inc.*, No. 01-CV-4129 (JGK), 2002 WL 1461351, at *7 (S.D.N.Y. July 8, 2002) (quoting *Est. of Anglin v. Est. of Kelley*, 270 A.D.2d 853, 854 (4th Dep't 2000)).  As a threshold matter, the Purchase Agreement stated that any waivers "must be in writing . . . ."  Purchase Agreement § 9(f).  Apogee has not raised, and the Court has not found, any writing waiving the

December 18, 2014 deadline. *See Towers Charter & Marine Corp.*, 894 F.2d at 522 (concluding that a party's reliance on alleged oral waivers was "foreclosed as a matter of law" because the written contract stated that there could be no waiver unless the waiver were in writing). Although a no-waiver clause may itself be waived, including by a party's conduct, Apogee has made no attempt to explain how filing a Form S-3 to register the Initial Shares waived anything. *See Am. Railcar Indus., Inc. v. GyanSys, Inc.*, No. 14-CV-8533 (JSR), 2017 WL 11501888, at *7 (S.D.N.Y. Nov. 14, 2017) (concluding that a plaintiff's "passive acceptance" of a defendant's late conduct under the contract did not constitute waiver, in part because the contract required any waiver to be in writing).[21]

For all of those reasons, the Court concludes that there is a question of fact whether IGC breached the Purchase Agreement by failing to issue 673,846 freely tradable Initial Shares to Apogee on February 3, 2015, and whether Apogee is entitled to damages for that breach.

---

[21]    In Apogee's counterstatement of material facts, Apogee makes two other arguments against enforcing the plain terms of the Purchase Agreement. *See* Consolidated Rule 56.1 Stmt. ¶ 68.  Even assuming, *arguendo*, that Apogee had properly made these arguments in its memorandum of law, they would fail.

First, Apogee argues that the December 18, 2014 deadline was inconsequential because the parties initially extended the Initial Closing date from December 11, 2014, until December 18, 2014, due to Apogee's failure adequately to capitalize Midtown.  *See* Consolidated Rule 56.1 Stmt. ¶ 68.  The parties' decision to extend Apogee's deadline to December 18, 2014, did not excuse Apogee's obligation to make the capital infusion; it is undisputed that the parties did not extend the deadline beyond that date, at which point Apogee had not adequately capitalized Midtown.  *See Am. Railcar Indus., Inc. v. GyanSys, Inc.*, No. 14-CV-8533 (JSR), 2017 WL 11501888, at *7 (S.D.N.Y. Nov. 14, 2017) (concluding that, notwithstanding the plaintiff's agreement to waive an initial deadline, the plaintiff did not waive its right to performance by a "revised deadline," which the defendant "also missed").

Second, Apogee asserts that IGC "never raised an issue with Apogee" regarding its failure adequately to capitalize Midtown.  *See* Consolidated Rule 56.1 Stmt. ¶ 68.  But a party does not waive its rights under a contract "by failing to insist upon performance at the due date and by urging and encouraging the other party to perform thereafter."  *Parker Hannifin Corp. v. N. Sound Props.*, No. 10-CV-6359 (MHD), 2013 WL 1932109, at *8 (S.D.N.Y. May 8, 2013) (quoting *S.P. Hicks & Son Co. v. J.T. Baker Chem. Co.*, 307 F.2d 750, 752 (2d Cir. 1962)). Apogee's failure adequately to capitalize Midtown was also not, strictly speaking, a breach of the parties' contract; it merely reduced the number of Initial Shares to which Apogee was entitled.  Moreover, as discussed *supra*, IGC persistently stated that Apogee's entitlement to the full block of Initial Shares was subject to adjustment depending on Midtown's balance sheet.

### III.   Apogee Breached the Purchase Agreement by Failing to Use Best Efforts to Secure FINRA Approval

Apogee asserts that it did not breach the Purchase Agreement by failing to use best efforts to secure FINRA approval for IGC's acquisition of Midtown by June 30, 2015, because IGC materially breached the Purchase Agreement first, on February 3, 2015.  *See* Defs. Mem. at 8.  Although there is a question of fact whether IGC breached the Purchase Agreement, Apogee elected to perform under the Purchase Agreement; Apogee was, therefore, obligated to use best efforts to obtain FINRA approval of Midtown's acquisition by June 30, 2015.  Because it failed to do so, Apogee breached the Purchase Agreement.

Apogee was aware that IGC had issued the Initial Shares in restricted rather than in freely tradable form by February 6, 2015, at the latest.  *See* Consolidated Rule 56.1 Stmt. ¶ 58. Nevertheless, Apogee accepted the 700,000 Initial Shares on April 23, 2015, *id.* ¶ 151, and continued over the following few weeks to collect information and prepare documents to secure FINRA approval, *id.* ¶¶ 73–90.  Because Apogee "knew of" IGC's purported breach yet "continued to perform and accept performance" under the Purchase Agreement, it cannot justify its own breach by invoking IGC's purported breach.  *Lockheed Martin Transp. Sec. Sols. v. MTA Cap. Constr. Co.*, No. 09-CV-4077 (PGG), 2014 WL 12560686, at *21 (S.D.N.Y. Sept. 16, 2014); *see also Bigda v. Fischbach Corp.*, 849 F. Supp. 895, 901 (S.D.N.Y. 1994) (concluding that by electing to "continue to enjoy the benefits" of a contract, the plaintiff "relinquished the opportunity to terminate" the agreement because of the defendant's breaches); *cf. Marathon Enters., Inc. v. Schroter GMBH & Co.*, No. 01-CV-0595 (DC), 2003 WL 355238, at *6 (S.D.N.Y. Feb. 18, 2003) (concluding that there was a triable issue of fact as to whether a defendant had the right to consider a contract void or whether it had elected to continue the contract after the plaintiff materially breached).

Despite the fact that there was a complete CMA ready for signoff, *see* Consolidated Rule 56.1 Stmt. ¶¶ 86–87, Apogee failed to submit the requisite paperwork to FINRA to start the approval process, *id.* ¶ 91.   Under New York law, the phrase "best efforts" requires "a party [to] use all reasonable means to achieve the contractual object at issue."   *Harbinger F&G, LLC v. OM Grp. (UK) Ltd.*, No. 12-CV-5315 (CRK), 2015 WL 1334039, at *28 (S.D.N.Y. Mar. 18, 2015) (collecting cases); *see also Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 124 (2d Cir. 2013) (explaining that "best efforts" clauses impose "at least an obligation to act with good faith in light of one's own capabilities" (internal quotation marks and citation omitted)).   Although determining whether a party used "best efforts" under a contract "almost invariably" is a question of fact that cannot be resolved at summary judgment, *Kroboth v. Brent*, 215 A.D.2d 813, 814 (3d Dep't 1995), this is one of the rare cases when failure to use best efforts is ascertainable as a matter of law.   Apogee makes no effort to explain why it failed to submit the CMA to FINRA beyond invoking IGC's breach,[22] which, for the reasons discussed *supra*, does not excuse its nonperformance, *cf. Koninklijke Ahold, N.V. v. SMG-II Holdings Corp.*, 290 A.D.2d 375, 375–76 (1st Dep't 2002) (affirming the dismissal of a defendant's counterclaim for breach of contract based on the plaintiff's alleged failure to use best efforts at summary judgment because the defendant "failed to submit any evidence countering [the] plaintiff's prima facie showing" that it had used best efforts); *Cambridge Assocs. v. Town of N. Salem*, 228 A.D.2d 537, 539 (2d Dep't 1996) (affirming the trial court's determination, "as a matter of law," in the context of a motion for a temporary restraining order, that a party failed to use its best efforts to

---

[22]     Apogee filed a "BD Amendment" with FINRA, which permitted IGC to acquire a 24.9% ownership interest in Midtown.   *See* Consolidated Rule 56.1 Stmt. ¶ 38.   That is irrelevant, however, because it is undisputed that Apogee was required to file the CMA to secure permission for IGC to obtain 100% ownership of Midtown, yet failed to do so.   *Id.* ¶¶ 38, 91.

satisfy the terms of a settlement agreement); *see also Azeez v. City of New York*, No. 16-CV-342 (NGG), 2018 WL 4017580, at *6 (E.D.N.Y. Aug. 22, 2018) ("Ordinarily, any issues not addressed in an opposition brief are deemed abandoned by the party opposing the motion." (citing *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014)).

For all of those reasons, the Court concludes that Apogee breached the Purchase Agreement by failing to use best efforts to secure FINRA approval by June 30, 2015, of Midtown's acquisition by IGC; damages will be determined at trial.[23]

## IV.     Apogee Breached the Loan Agreement

The parties do not dispute that IGC lent Apogee $70,000 pursuant to a valid contract that required repayment by May 6, 2015, and that Apogee never repaid IGC.  *See* Consolidated Rule 56.1 Stmt. ¶¶ 92–97; Loan Agreement, Dkt. 89-11.  Apogee fails to address this breach at all in its response to IGC's motion and, therefore, appears to have abandoned any defense.[24]  *See Azeez*, 2018 WL 4017580, at *6.

Although Apogee stated in response to IGC's interrogatories that "[n]o balance is due" to IGC on the loan "because IGC and Mukunda owe Apogee far in excess of $70,000," *see* Defs.

---

[23]     The Court agrees with IGC that Section S3 of Schedule A, which set forth the parties' agreed upon penalties if Apogee failed timely to secure FINRA approval, generally applies here because "Apogee and Midtown [were] unable to obtain FINRA approval by June 30, 2015." *See* Purchase Agreement Schedule A § S3.  It is unclear at this stage, however, whether any of the specific provisions in Section S3 of Schedule A apply because the parties dispute the extent to which the shares issued pursuant to the contract were required to be freely tradable.

If, as IGC contends, it had no obligation to issue freely tradable shares to Apogee, then it did in fact issue "1,200,000 Initial Shares" and subsection 2(a) of Section S3 of Schedule A applies, requiring Apogee to pay IGC the equivalent of 700,000 IGC shares and $125,000 in damages.  For reasons that are unclear, IGC concedes that the 700,000 penalty shares would be subtracted from the 1,200,000 shares IGC issued such that Apogee would be entitled to keep the value of 500,000 IGC shares.  *See* Pl. Mem. at 18–19.

If, as Apogee contends, the term "Initial Shares" presumes that the shares are freely tradable, then none of the provisions in Section 3 of Schedule A applies because IGC only issued 700,000 such shares.  The proper measure of damages is, therefore, a question of fact that must be determined at trial.

[24]     Because Apogee does not challenge the application of New York law, the Court assumes that New York law governs the Loan Agreement.

Interrogs. Resps., Dkt. 89-9, No. 17, it is well established that "the fact [the breaching party] may have a counterclaim against [the nonbreaching party] does not preclude the entry of summary judgment against [the breaching party] for the undisputed amount it owes" under the contract. *Tycoons Worldwide Grp. (Thailand) Pub. Co., Ltd. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 203–04 (S.D.N.Y. 2010) (granting summary judgment against the breaching party and collecting cases).

For all of those reasons, the Court grants IGC's motion for summary judgment against Apogee in the amount of $70,000, plus prejudgment interest as of May 7, 2015. *See Citibank, N.A. v. Jacobsen*, No. 19-CV-959 (ER), 2020 WL 7046841, at *7 (S.D.N.Y. Dec. 1, 2020) (granting summary judgment for breach of a loan agreement because the contract's plain language unambiguously required defendants to repay the plaintiff, and defendants "failed to do so").

## V.    Clarke's Claim for Breach of a Purported Shares Agreement Is Time Barred

In the Amended Counterclaim, Clarke alleged that IGC "ratified" its CEO's promise to pay Clarke 200,000 shares of IGC common stock "in exchange for Clarke's role and work as IGC's interim treasurer and chief financial officer" on July 14, 2016.  Second Am. Countercl., Dkt. 62, ¶¶ 52–53.  IGC previously moved to dismiss this claim on the grounds that it was untimely under Maryland law; the Court denied the motion because it found that Clarke alleged facts from which the Court could reasonably infer that the claim had been revived in December 2018, when Clarke allegedly asked Mukunda to reassure him that IGC would pay Clarke the 200,000 shares he was owed and "Mukunda confirmed that he intended to keep IGC's promise to

pay Clarke 200,000 shares of IGC's common stock." *See* Op. & Order, Dkt. 44, at 10–12

(quoting Am. Countercl., Dkt. 31, ¶ 70).[25]

In his response to IGC's summary judgment motion, however, Clarke fails to address,

and thereby abandons, his position that his agreement with IGC was revived in December 2018

under Maryland's debt acknowledgment doctrine. *See Azeez*, 2018 WL 4017580, at *6; *Morris*

*& Ritchie Assocs., Inc. v. H & H Rock, LLC*, No. 1824 (LG), 2018 WL 679878, at *17 (Md. Ct.

Spec. App. Jan. 30, 2018) (stating that the party "trying to evoke an exception to the statute of

limitations" has "the burden to prove the exception" (quoting *Newell v. Richards*, 594 A.2d

1152, 1156 (Md. 1991)).[26]

Instead, Clarke proposes the novel theory that he entered into a "fresh agreement" with

IGC in December 2018 because Mukunda promised him that he would be paid 200,000 IGC

shares *in exchange* for introducing Mukunda to a cannabis company. *See* Defs. Mem. at 10. It is

well established, however, that "it is inappropriate to raise new claims for the first time in

submissions in opposition to summary judgment . . . ." *Wilson v. City of New York*, 480 F.

App'x 592, 594 (2d Cir. 2012) (summary order) (internal quotation marks omitted); *see also*

*Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 295 n.12 (E.D.N.Y. 2013) (disregarding a

plaintiff's arguments because she could not "amend her complaint simply by alleging new facts

---

[25]    The Court did not decide whether Maryland law, which has a three-year statute of limitations for breach of contract claims, or New York law, which has a six-year statute of limitations for breach of contract claims, applies to the Shares Agreement because it concluded that Apogee's claim was timely under either statute at the motion-to-dismiss stage. *See* Op. & Order, Dkt. 44, at 12.

[26]    In contrast to the position Clarke took when briefing the motion to dismiss his counterclaim, in connection with IGC's motion for summary judgment, both parties argued Maryland law. *See* Pl. Mem. at 21–22; Defs. Mem. at 10. The Court, therefore, assumes that Clarke now concedes that Maryland's three-year statute of limitations governs his claim for breach of the Shares Agreement. *See Hilton Head Holdings b.v. v. Peck*, No. 11-CV-7768 (KBF), 2012 WL 613729, at *5 n.6 (S.D.N.Y. Feb. 23, 2012) (collecting cases) (applying New York law to a claim because both parties assumed that New York law applied; the plaintiff "track[ed] the elements of the claim under New York law").

and theories in her memoranda opposing summary judgment" (cleaned up and citation omitted)). Clarke's assertion that he was promised 200,000 IGC shares in exchange for making a business introduction contradicts the Second Amended Counterclaim, which alleges that Mukunda merely reaffirmed his earlier promise to deliver to Clarke 200,000 IGC shares.[27]   Clarke has, therefore, failed to defeat IGC's motion for summary judgment as to the Shares Agreement.[28]

For all of those reasons, the Court grants IGC's motion for summary judgment on Clarke's claim for breach of the Shares Agreement.

## CONCLUSION

For the foregoing reasons, IGC's motion for summary judgment is DENIED as to Apogee's claim that IGC breached the parties' Share Purchase Agreement and otherwise GRANTED.  The Court will issue a final judgment once all claims have been resolved.

Not later than **Friday, August 4, 2023**, the parties must file a joint status letter (a) indicating whether the Court should refer the parties to a magistrate judge for a settlement conference and (b) proposing a trial schedule, including deadlines for: motions in limine and responses; motions to preclude expert witnesses; the parties' joint pretrial order, pre-marked trial exhibits, proposed findings of fact, and proposed conclusions of law; a final pretrial conference;

---

[27]     This distinction is crucial for the purposes of Maryland's debt acknowledgement doctrine, which only applies when a promise to revive a debt is "unaccompanied by any qualification." *Hall v. Barlow*, 272 A.2d 386, 391 (Md. 1971); *see also Potterton v. Ryland Grp., Inc.*, 424 A.2d 761, 763 (Md. 1981).  Because Apogee and Clarke now maintain that Mukunda's 2018 promise to Clarke was conditioned on Clarke making a business introduction, the debt acknowledgement doctrine does not apply.  Accordingly, Clarke's only claim is time barred under Maryland law.

[28]     Clarke also asserts that IGC's motion should be denied because IGC did not produce its Employee Stock Ownership Plan, which would provide information regarding when Clarke's shares were scheduled to vest.  *See* Defs. Mem. at 10.  The terms surrounding the vesting of Clarke's shares are irrelevant, however, because Clarke failed to allege in his counterclaim the "fresh" contract claim that he now asserts for the first time at summary judgment.

and the trial date.  The parties must propose at least three mutually agreeable trial dates before

March 31, 2024.

The Clerk of Court is respectfully directed to close the open motion at Docket Entry 87

and to terminate Ramachandra Mukunda as a party in this action.

**SO ORDERED.**

**Date:  July 20, 2023**
**New York, New York**

          **VALERIE CAPRONI**
          **United States District Judge**